EDGAR B. ODELL, Respondent, *v*. EDWARD L. WELLS and JOHN S. CAPRON, Appellants.

Fourth Department, May 3, 1918.

Corporation — contract of original incorporators to pay salaries to each other and to repurchase stock if salary should discontinue — such contract valid only during period corporation is controlled by original stockholders — right to repurchase of stock on discontinuance of salary not enforcible after death of incorporator and accrual of rights of new stockholders.

Where a contract for the incorporation of a mercantile business in substance provided that the parties to the contract should be the four directors, that each of them should hold a specified office and receive a certain annual salary, with a further agreement that if the directors should subsequently vote to reduce or increase the salary of any party, or if any party should be defeated for re-election to the directorate and he should not vote in favor of such resolution, he should have the right to have his stock purchased for cash by the parties voting in favor of either of such resolutions, the contract for the repurchase was valid and binding only so long as the parties thereto were the only stockholders of the corporation. Hence when one of the parties died and his stock was distributed to his next of kin so that they became interested in the corporation, the agreement not to reduce the salary of one of the original incorporators without purchasing his interest became illegal and void if such action of the directors was not for the true interests of the corporation, as otherwise the rights of the new members would be impaired.

It follows that where after the rights of new stockholders had accrued, one of the original incorporators became ill and unable to attend to business as he was required to do under the contract, the subsequent action by the remaining directors annulling his salary did not give him a right of action to enforce his option to compel the purchase of his stock.

*It seems*, that as the plaintiff is unable to render any service to the corporation as required except to sit as a member of its board of directors, it is questionable whether the board could lawfully vote him a salary as a mere incident of such office.

*It seems*, that the question as to the right and propriety of dispensing with the plaintiff's services because of his ill-health and absence from the business was properly left to the jury.

MERRELL, J., dissented.

APPEAL by the defendants, Edward L. Wells and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Oneida

on the 15th-day of December, 1917, upon the verdict of a jury, and also from an order entered in said clerk's office on the same day denying defendants' motion for a new trial made upon the minutes, with notice of an intention to bring up for review an intermediate order granting plaintiff an extra allowance of costs.

Plaintiff's recovery has been had for breach by the defendants of a contract by which defendants agreed under certain circumstances to purchase of plaintiff his 560 shares of the capital stock of " J. B. Wells & Son Company," a corporation which conducts a department store in the city of Utica. The contract was in writing and was entered into on March 31, 1906. There were four parties to the contract, namely, the plaintiff, the two defendants, and one Robert S. McIntyre, since deceased. It provided for the formation of a corporation by these four parties under the name of J. B. Wells & Son Company, with a capital of $225,000 divided into 2,250 shares of $100 each, and that the corporation should acquire and take over the general dry goods and department store business theretofore conducted by defendants as copartners under the firm name of J. B. Wells & Son Company, including all the assets and good will of this copartnership. For these assets the corporation was to issue to the defendant Capron 560 shares, and to the defendant Wells 1,690 shares, being all the authorized capital, and Wells agreed to sell to plaintiff 560 of his shares at par, and to McIntyre 100 shares at par. These two had had no former connection with the business. The contract also provided that the parties thereto should be the four directors which the corporation was authorized to have, and that Wells should be president, Capron vice-president, and Odell secretary and treasurer; that each of the directors should devote his time and best ability to the business of the corporation; that Wells should receive an annual salary of $3,000, Odell of $3,500 and McIntyre of $2,500, all payable monthly; that Wells, in addition to performing the usual duties of president, should have charge of certain stocks of merchandise, Capron and McIntyre each of certain other stocks, and Odell, in addition to the usual duties of secretary and treasurer, should have charge of the finances of the corporation, the advertising and the help.

The contract contained other provisions not material to be noted here, and concluded with the following provision under which the principal questions involved in this action arise:

" If, first, the board of directors shall at any time vote to reduce or increase the salary of any party hereto, and any party hereto shall not vote in favor of such reduction or increase; or, secondly, if any party hereto shall be defeated for re-election to the directorship hereinbefore agreed to be given to him, in the first case the stock of the party or parties not voting in favor of such proposition shall at his or their option be purchased and paid for in cash by the parties voting in favor of such proposition at its actual value based upon the net assets of such corporation; and in the second place, the stock of the party defeated for re-election and that of any party voted in favor of said re-election shall at the option of such party or parties be purchased and paid for in cash at its actual value based upon the net assets of the corporation by the owner or owners of the stock voted against said re-election."

Pursuant to this contract the four parties proceeded at once to organize the corporation and take over the business. They appointed themselves directors for the first year. At the first meeting of the directors held April 4, 1906, the board adopted a resolution to the effect that as the present directors are to take active part in the business and devote their entire time to the same, they shall receive annual salaries payable monthly for the several amounts already stated as specified in the contract. Plaintiff Odell paid defendant Wells $56,000 for his 560 shares, and McIntyre $10,000 for his 100 shares.

McIntyre died about January 1, 1907, and on April 3, 1907 his 100 shares were transferred to and became the property of his widow, who held the same until January 18, 1917, when she transferred the same to two sisters of the defendant Wells, 50 shares to each.

On or about April 27, 1906, defendant Capron transferred ten shares of his stock to Frank Morath, and defendant Wells twenty-five shares of his stock to said Morath, and after the death of McIntyre, Morath, who was the head of one of the departments in the store, was made a director in his place.

McIntyre received his salary as long as he lived. Plaintiff and defendant Capron received theirs until February, 1917, but the salary of defendant Wells was paid to him for only a few months and then discontinued for reasons not explained at the trial. It does not appear whether there was any resolution of the directors on the subject of salaries subsequent to the original resolution of April 4, 1906.

In January, 1914, defendant Wells transferred 100 shares of his stock to his sister Mary L. Wells, and another 100 shares to his sister Anna S. Evans.

In March, 1915, Frank Morath transferred twenty-five of his shares to said Mary L. Wells.

In February, 1916, plaintiff transferred to his son Frederick E. Odell ten of his shares for the purpose of qualifying him to act as a director, but with intent, as is claimed, not to part with the ownership.

Plaintiff and defendants continued to be directors and the principal managers of the business from its organization in 1906 until plaintiff became ill on August 9, 1916. From that time until the annual meeting of the stockholders February 19, 1917, his son, Frederick E. Odell, who in February in the previous year had been elected a director in place of Morath and appointed secretary of the company by the directors, undertook to and did to a certain extent perform the duties of his father as treasurer and otherwise. Plaintiff's illness continued through the summer and fall of 1916 and the following winter. He improved somewhat during the winter and on February 1, 1917, went south and did not return to Utica until the middle of April.

By the purchase in January, 1917, of Mrs. McIntyre's stock by the sisters of the defendant Wells, he and his sisters together became the owners of the majority of the shares and were in a position thereafter to dictate the policy of the company.

Prior to the annual meeting of the stockholders held February 19, 1917, Mr. Wells procured notice to be given that the stockholders would at that meeting vote upon the proposition to increase the number of directors from four to five and such a resolution was adopted at that meeting. The meeting was then adjourned until February twenty-third,

at which time five directors were elected, namely, defendants Wells and Capron, plaintiff Odell, Wells' sister, Mrs. Evans, and Mr. Martin, who was Wells' personal attorney. At a meeting of this board of directors held the same day, February twenty-third, a resolution was adopted to the effect that after that date none of the officers or directors of the company should receive any salary except the defendants Wells and Capron. Plaintiff was still in the south and was not present at that meeting. Both defendants voted in favor of the resolution of the directors discontinuing plaintiff's salary. Plaintiff, not being present, did not vote.

On May second plaintiff served upon defendants a written notice tendering to them his 560 shares and demanding that they purchase the same according to the contract. This demand was not complied with and in August plaintiff brought this action to recover the contract price.

*Richard R. Martin* [*Martin & Jones*, attorneys], *William A. Matteson* and *E. Willard Jones* of counsel, for the appellants.

*T. Harvey Ferris* [*Dunmore, Ferris & Dewey*, attorneys], *N. E. Kernan* and *C. R. Dewey* of counsel, for the respondent.

FOOTE, J.:

Two principal questions are presented upon this appeal: *First*, as to whether the contract properly construed remained in force on February 23, 1917 at the time the directors discontinued plaintiff's salary, and *second*, whether plaintiff's necessary absence from the business on account of illness from August 9, 1916, until after the meeting of February 23, 1917, authorized and justified the defendants in voting as directors to discontinue plaintiff's salary without incurring liability to purchase plaintiff's share in the company.

Upon the first question the trial court declined to charge the jury that the contract had ceased to be in force, and practically held that it had not unless the parties themselves had treated it as abandoned. On the second question it was left to the jury to say whether there was a breach of the contract by plaintiff in absenting himself from the business for so long a time under the circumstances.

This is a peculiar contract. It is without an express time

limit. It makes no provision for the contingency of the death or long-continued illness of one or more of the parties or of the sale of all or any of their shares. As to these matters we must find their intent in what they saw fit to embody in the contract for we are not aided by their subsequent acts or their own construction of it.

Defendants contend that the plan of the contract could be fulfilled only so long as all four of the parties continued to own their shares and to act as directors, officers and heads of departments; that upon the death of McIntyre in January, 1907, this was no longer possible, and that the executory provisions of the contract as to directorships, offices, services and salaries ceased to be operative or in force from that time.

This was a question of law for the court. It was not claimed that the three survivors made any new arrangement to continue the contract in force. Upon McIntyre's death, his 100 shares became the property of his widow, who continued to hold them for the next ten years. During that time plaintiff and both defendants were directors. As such they were her trustees in duty bound to cast their votes in the board of directors on the questions of the election of officers and fixing of salaries according to the true interests of the company. Any contract on their part to do otherwise, or by which if they voted to reduce the salary of one of the company's officers they would incur a liability to purchase his shares would be dishonest, illegal and void. (*West* v. *Camden,* 135 U. S. 507; *Wilbur* v. *Stoepel,* 82 Mich. 344; *Cone* v. *Russell & Mason,* 48 N. J. Eq. 208; *Guernsey* v. *Cook,* 120 Mass. 501; *Bliss* v. *Matteson,* 45 N. Y. 22; *Timme* v. *Kopmeier,* 162 Wis. 571; Morawetz Priv. Corp. [2d ed.] § 519.) Since the contract as to these matters would have been void in its inception had there been stockholders who were not parties to it and since it would become void so far as unexecuted from the time persons not parties acquired shares of stock, I think we should assume that the parties did not intend the contract to remain in force after there were new stockholders who were not bound by it.

Again, each of the four parties had duties to perform under the contract in which each of the others had a vital interest. Each was entitled to have each of the others perform his

assigned part in the enterprise. Neither could furnish a substitute. The judgment and experience of each was to be at the service of the others in the board of directors and in the offices and as heads of the departments. In short, the contract was made in contemplation of the continued participation of all the parties so long as it remained in force. The death of one would in all probability require a readjustment of duties and salaries and might even make it advisable to discontinue or dispose of the business. It is true that no such result followed the death of Mr. McIntyre. He was perhaps not as essential to the business as some of the others. But that is not the test. We cannot say that it was intended that the contract should remain in force in case of his death and should terminate in case of the death of Wells or plaintiff. But the death of either or both of the latter would no doubt necessitate bringing in new men as managers and a readjustment of duties and salaries. How can we say it was intended that the contract was to continue if one died, but if two should die, it would end? Where shall we draw the line? I find nothing in the contract itself indicating that the parties intended that the contract should continue to govern the conduct of any three of them after one had died. It is said by plaintiff that the other three did treat the contract as in force after McIntyre's death because they took the inventory in February, 1907, and adjusted the purchase price of the stock of merchandise according to its amount and value as so ascertained. The merchandise and accounts were taken over by the corporation at a certain estimated valuation. The contract provided that at the next inventory if the assets proved to be less, then Wells and Capron should pay the difference to the company, and if more, then the company should pay the excess to Wells and Capron. Which way the difference was found does not appear. It simply appears that the difference as found was adjusted. Of course, this part of the contract would not be terminated by the death of either or all of the parties. The corporation had paid too much or too little for the assets. Either it owed money to Wells and Capron or they owed money to it. It was a past transaction by which one party had become debtor to the other and even the termination of the contract would not discharge the lia-

bility. The parties did follow the contract method of ascertaining the amount of this liability and to which party it was due. This did not, I think, indicate any intention one way or the other as to the remaining executory provisions as to voting for officers and salaries.

Respondent's counsel refers with confidence to the case of *Lorillard* v. *Clyde* (86 N. Y. 384), also appeals in subsequent actions between the same parties (reported 99 N. Y. 196; 122 id. 41, and 142 id. 456). The contract considered in those cases was one made between the owners of two competing lines of steamships by which they agreed to form a corporation which should take over both lines of ships and continue the business and by which the defendant Clyde should be appointed manager of the lines for a term of seven years, in consideration of which he guaranteed to Lorillard seven per cent dividends upon his shares. The actions were brought by Lorillard to recover upon the guaranty of dividends. The contract was held to be lawful and enforcible.

The case is not like the present case for none of the parties died, nor were there any other stockholders than the parties to the contract either at the time it was made or subsequently. The last case is reported in 142 New York, and it appears that that action was to recover the dividends for the last two years of the seven-year period; that after five years from its organization the corporation was dissolved in a suit brought by the Attorney-General in the name of the People. One of the questions was whether the contract of guaranty continued in force after the dissolution of the corporation, and it was held that it did not. In the course of the opinion upon this subject, Chief Judge ANDREWS said: " But it is now well settled that when performance depends on the continued existence of a given person or thing, and such continued existence was assumed as the basis of the agreement, the death of the person or the destruction of the thing, puts an end to the obligation." I think that principle is applicable in this case, because full performance of the contract here cannot be had without the continued existence of Mr. McIntyre.

Respondent's counsel also relies upon the case of *Drucklieb* v. *Harris* (209 N. Y. 211). By the decision in that case the court sustained a demurrer to the complaint which sought

to compel defendants, who were in control of a corporation, to change certain entries upon its books affecting the apparent or book value of plaintiff's shares, he holding a contract with the defendant Harris by which the defendant had undertaken to purchase these shares at their book value in case plaintiff was not continued in the employ of the corporation at a salary named in the contract. The court held that an action in equity could not be maintained for such a purpose. In the course of the opinion of Chief Judge CULLEN he states that there had been no breach of the contract by the defendant, that is, that plaintiff was still in the employ of the corporation at the agreed salary. It was urged by the defendants in that case that the contract was void as against public policy because it undertook to influence the action of the defendant and his son in voting as directors of the corporation. On this subject Chief Judge CULLEN says: "The first point made by the appellants is that the contract on which plaintiff bases his cause of action is void as contrary to public policy, because by it the said defendant Harris is subjected to liability in case the corporation does not continue the plaintiff as a director and officer, while his fiduciary relation to the corporation obligates him to act for the best interests of the corporation, which may require a termination of or a failure to continue the plaintiff's employment. As has been said, ' An agreement which is designed, or which in its nature and effect tends to lead persons who are charged with the performance of trusts or duties for the benefit of others to violate or betray them, is contrary to public policy and void and cannot be enforced.' Doubtless such a general rule is correct, but it is not applicable to the case before us. The only stockholders of the corporation were the plaintiff and the defendant, Sam H. Harris." So in the present case the contract is not open to the objection that it is against public policy so long as the parties to the contract are the only stockholders in the company and so long as it does not express an intention that it shall continue in force beyond that time.

There is nothing in either of these cases upon which plaintiff relies, holding that future owners of shares deriving their title from or through one of the parties to the contract are bound by it to permit the directors to vote against their

interests or the interests of the company. Future owners are, no doubt, bound by the transactions of the directors to which the then owner of their shares had consented, but where the transactions are against the interests of the company and would constitute a breach of trust by the directors toward the shareholders but for the latter's consent and acquiescence, such consent cannot bind future owners of the shares to permit transactions of the same character to be repeated or continued.

In the case of *Bloxam* v. *Metropolitan Ry. Co.* (L. R. 3 Ch. App. Cas. 336) Lord CHELMSFORD, in considering a question of this character, said: " If the acts of the directors were positively illegal, the fact of knowing them, or even of deriving benefit from them, would not have prevented the original holder of the stock from afterwards objecting to similar acts. But it never can be held that the acquiescence of the original holder of stock in illegal acts of the directors of a company will bind a subsequent holder of that stock to submission to all future acts of the same character."

It should also be pointed out that plaintiff bases his right to require defendants to purchase his shares only .upon the fact that both defendants voted as directors to discontinue plaintiff's salary at the directors' meeting on February 23, 1917. The form of the resolution as recorded is as follows: " Motion was made and seconded that none of the officers or directors of the company receive any salary after this date except E. L. Wells and John S. Capron." This was adopted unanimously, all the directors being present except plaintiff, who was absent in North Carolina convalescing from his illness. Earlier in this meeting defendant Wells had been elected to the offices of president and treasurer and appointed general manager of the company for one year, his salary for all these positions being fixed at $3,000. Defendant Capron had been elected vice-president and his salary was fixed at $2,400, he to continue to devote his time to the business of the store as before. The election of a secretary was deferred to a later meeting and meantime the office was declared vacant. A resolution was adopted authorizing the president and general manager to employ an assistant manager at the store at a salary not to exceed $4,000 per year. The result was that plaintiff was no longer an officer but

remained a director and his salary as secretary and treasurer and manager of the finances, advertising and help was discontinued. I assume that the intention was that his former duties in reference to these matters should be performed by the president and the new assistant manager. In all these matters, there was nothing which under the contract would entitle plaintiff to require defendants to purchase his shares, unless it was the discontinuance of his salary. Upon that act alone he must rely. Having dispensed with his services as an officer and an active participant in the management of the company's business, the directors should, as he contends, have continued his salary as before. If plaintiff was to render no service to the corporation, except to sit as a member of its board of directors, it may well be doubted whether the board could lawfully vote him a salary as a mere incident of his office. (*Godley* v. *Crandall & Godley Co.*, 212 N. Y. 121.) We are referred to no by-law to permit it.

While the question is not free from difficulty, I think the necessary construction of the contract is that it was not intended to remain in force as to the executory provisions on the subject of voting by the directors for officers and for fixing salaries, beyond the joint lives of the parties, and that the trial court should have dismissed the complaint, upon defendants' motion upon that ground.

Having reached this result, we need not consider the other grounds for reversal. I may say, however, that I think the question as to the right and propriety of dispensing with plaintiff's services because of his ill health and absence from the business was properly left to the jury.

I recommend that the judgment and order be reversed, with costs, and the complaint dismissed, with costs.

All concurred, except MERRELL, J., who dissented and voted for affirmance upon the authority of *Drucklieb* v. *Harris* (209 N. Y. 211) and *Lorillard* v. *Clyde* (86 id. 384); DE ANGELIS, J., not sitting.

Judgment and order reversed, with costs, and complaint dismissed, with costs.